802 F.2d 1227
 Charles Troy COLEMAN, Petitioner-Appellant,
v.
John N. BROWN, Warden, Oklahoma State Penitentiary at
McAlester, Oklahoma; Larry Meachum, Director, Department of
Corrections, State of Oklahoma; and the Attorney General of
the State of Oklahoma, Respondents-Appellees.
 No. 85-1094.
 United States Court of Appeals,
Tenth Circuit.
 Sept. 30, 1986.
 
 Edward L. Munson, Tahlequah, Okl., for petitioner-appellant.
 David W. Lee, Asst. Atty. Gen., Chief, Criminal & Federal Divisions (Michael C. Turpen, Atty. Gen. of Oklahoma, Robert A. Nance, Deputy Chief, Federal Div., Hugh A. Manning, Asst. Atty. Gen., and Susan Stewart Dickerson, Asst. Atty. Gen., with him on the briefs), Oklahoma City, Okl. for respondents-appellees.
 Before HOLLOWAY, Chief Judge, and LOGAN and SEYMOUR, Circuit Judges.
 LOGAN, Circuit Judge.
 
 
 1
 Petitioner, Charles Troy Coleman, appeals from the district court's denial of his application for a writ of habeas corpus and his motions for a stay of execution and an evidentiary hearing.
 
 
 2
 The issues on appeal are (1) whether prospective jurors for Coleman's trial were excused for cause improperly because of their opposition to the death penalty; (2) whether the exclusion of prospective jurors opposed to the death penalty from the guilt stage of the trial denied Coleman a jury representing a cross-section of the community and resulted in a conviction-prone jury; (3) whether Coleman was denied effective assistance of counsel in the sentencing stage of his trial, the guilt stage of his trial, or in the trial as a whole; (4) whether Coleman had a constitutional right to the appointment of an investigator to aid his attorney; (5) whether the prosecutor's remarks in closing arguments in both stages of the trial denied Coleman a fair trial; and (6) whether the district court erred in not granting Coleman an evidentiary hearing. We affirm.
 
 
 3
 Coleman was convicted of first-degree murder and sentenced to death by an Oklahoma jury on October 12, 1979. Evidence at trial showed that while Coleman was burglarizing the home of Dale and Delthea Warren, John and Roxie Seward walked in on him. John Seward was the brother of Delthea Warren. Coleman shot and killed the Sewards with a .28 gauge shotgun, apparently after he took them into the basement. Although there were no witnesses to the murders, the circumstantial evidence was overwhelming. There was evidence that this particular gauge shotgun was very rare and that Coleman owned one. Several hours after the murders, Coleman was stopped for a traffic violation and found in possession of Mrs. Seward's wallet. The police discovered in Coleman's truck sixty-four pounds of meat marked "Hogle, Not for Sale." Lon Hogle testified that he had given this meat to the Warrens. The police also found Mrs. Warren's watch beneath the back seat of the police car. Coleman's wife testified that Coleman gave her this watch while they were in the back seat of that vehicle. There was also testimony placing Coleman's truck at the Warren's home at the estimated time of the murder. None of this evidence was refuted.
 
 
 4
 The Oklahoma Court of Criminal Appeals affirmed Coleman's conviction and sentence. Coleman v. State, 668 P.2d 1126 (Okla.Crim.App.1983), cert. denied, 464 U.S. 1073, 104 S.Ct. 986, 79 L.Ed.2d 222 (1984). After the United States Supreme Court denied certiorari, Coleman filed an application for post-conviction relief in the state district court in Muskogee County. See Okla.Stat. tit. 22, Secs. 1080-1088. That court denied the application, and the Oklahoma Court of Criminal Appeals affirmed. Coleman v. State, 693 P.2d 4 (Okla.Crim.App.1984).
 
 
 5
 Coleman then filed in federal district court these applications for a writ of habeas corpus, an evidentiary hearing, and a stay of execution. The district court denied each of Coleman's applications.[1] This court granted a stay of execution, 753 F.2d 832, and has given full consideration to the appeal after briefing and oral argument.
 
 
 6
 * Coleman first contends that the trial court erred in excluding four jurors for cause under Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In Witherspoon the Supreme Court indicated that prospective jurors in a capital case could be excluded if they made it
 
 
 7
 "unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt. "
 
 
 8
 Id. at 522 n. 21, 88 S.Ct. at 1777 n. 21 (original emphasis). Many lower courts treated this as an absolute standard which had to be met fully before jurors could be excluded on the grounds of their scruples against the death penalty. But in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court rejected this restricted view of exclusion and adopted language from Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), as the exclusive standard:
 
 
 9
 "[A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court."
 
 
 10
 Id. 469 U.S. at 420, 105 S.Ct. at 850 (quoting Adams, 448 U.S. at 45, 100 S.Ct. at 2526 and adding emphasis); accord Darden v. Wainwright, --- U.S. ----, ----, 106 S.Ct. 2464, 2468, 91 L.Ed.2d 144 (1986).[2]
 
 
 11
 To be excluded from service, therefore, it is not necessary that prospective jurors would vote automatically against the death penalty or that their opinions on capital punishment would prevent them from rendering an impartial verdict. If a prospective juror conscientiously disapproves of the death penalty, that juror can be eliminated if any of that person's jury duties would be "substantially impaired." We must apply this standard to petitioner's case.
 
 
 12
 Of the four prospective jurors the trial court excused, the most questionable voir dire involved Larry Halpain:
 
 
 13
 "Court: [I]f you were sitting on a jury and in a case where the law and the evidence warranted and you were told it was a proper case to consider the death penalty, could you, if you felt it was proper, agree to a death penalty that did not [sic] without doing violence to your own conscience?"
 
 
 14
 Juror: No, I don't think I could.
 
 
 15
 Court: In other words, you're telling me that if you find beyond a reasonable doubt that the Defendant was guilty of Murder in the First Degree and if under the law and the evidence and all the circumstances you could consider a death penalty, you tell me that you have such reservations that you just simply could under no circumstances impose a death penalty upon another human being?
 
 
 16
 Juror: I don't think I could, no."
 
 
 17
 R. VI, 23. Halpain's responses sufficiently demonstrated that his beliefs about capital punishment would "substantially impair" his ability to serve as a juror.[3] His answers were markedly similar to those of the juror in Witt, whom the Court found justifiably excluded for cause. Witt, 469 U.S. at 412, 105 S.Ct. at 846, 850. In effect Halpain stated that he did not believe he would be able to apply the law as instructed.
 
 
 18
 Notably, the Witt Court ceded a great deal of authority to state trial judges to determine whether a juror should be excluded. A trial judge's finding that a prospective juror is biased is a "factual finding." Id. at 418, 105 S.Ct. at 849-50; Darden, --- U.S. at ----, 106 S.Ct. at 2468. Accordingly, a federal court, when reviewing a state decision pursuant to a petition for habeas corpus, must accord such findings a "presumption of correctness." 28 U.S.C. Sec. 2254(d). We see no grounds for overturning the trial judge's decision in this case.II
 
 
 19
 Coleman claims that the exclusion of jurors opposed to the death penalty from the guilt/innocence phase of his trial violated his right to a jury comprised of a fair cross-section of the community, and to a fair and impartial jury, in violation respectively of the Sixth and Fourteenth Amendments. The Supreme Court's recent decision in Lockhart v. McCree, --- U.S. ----, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), forecloses these arguments.
 
 III
 
 20
 Coleman next claims that he was denied his Sixth Amendment right to effective assistance of counsel. He asserts that his representation was inadequate in both the guilt and sentencing stages of his trial.
 
 
 21
 In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court adopted a two-part test for determining whether a criminal defendant has been denied reasonably effective counsel. The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687, 104 S.Ct. at 2064. The defendant must meet both of these requirements to succeed on an ineffective assistance of counsel claim. Id. A claim may thus be disposed of by a failure to show either of them. Id. at 697, 104 S.Ct. at 2069.
 
 
 22
 * Coleman raises several issues concerning the adequacy of his representation during the guilt stage of his trial; the essence of the claim is inadequate time to prepare. Specifically, Coleman asserts as error his counsel's failure to (1) investigate and present alibi evidence; (2) submit written briefs on particular motions; (3) prepare adequately for cross-examination of a particular witness; and (4) request an instruction that Coleman's refusal to testify should not be used against him. Although several of these claims are based on statements taken out of context, we have reviewed each of the contentions carefully and conclude that there is no reversible error. We address each of Coleman's arguments briefly.
 
 
 23
 Regarding the alibi evidence, an attorney has a duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691, 104 S.Ct. at 2066; accord Kimmelman v. Morrison, --- U.S. ----, ----, 106 S.Ct. 2574, 2588, 91 L.Ed.2d 305 (1986). The reasonableness of an attorney's decision not to conduct an investigation is directly related to the information the defendant has supplied. Strickland, 466 U.S. at 691, 104 S.Ct. at 2066; see also Mitchell v. Kemp, 762 F.2d 886, 888-89 (11th Cir.1985); United States v. DeCoster, 624 F.2d 196, 209 (D.C.Cir.1979) (en banc). In a capital case the attorney's duty to investigate all possible lines of defense is strictly observed. See generally House v. Balkcom, 725 F.2d 608, 615 (11th Cir.), cert. denied, 469 U.S. 870, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984); United States v. Golub, 694 F.2d 207, 215 (10th Cir.1982); cf. Caldwell v. Mississippi, 472 U.S. 320, ---- & n. 2, 105 S.Ct. 2633, 2640 & n. 2, 86 L.Ed.2d 231 (1985) (Eighth Amendment requires "greater degree of scrutiny of the capital sentencing determination" (quoting California v. Ramos, 463 U.S. 992, 998-99, 103 S.Ct. 3446, 3451-52, 77 L.Ed.2d 1171 (1983)).
 
 
 24
 On the second day of trial, Coleman specifically requested before the court that his attorney subpoena an elderly woman who lived across the street from Coleman's brother, in order to establish an alibi.[4] Although Coleman did not know this witness' name, he did know and reveal where she lived. Coleman's attorney apparently made no effort to contact this witness. In light of the strong case against Coleman and the seriousness of the charges, it was improper for his attorney to fail to investigate what was perhaps Coleman's sole line of defense. A defendant is not entitled to an attorney who will "leave not the smallest stone unturned," see DeCoster, 624 F.2d at 210, but when the defendant has but one stone, it should at least be nudged.
 
 
 25
 We must therefore address the prejudice question. Absent this failure, was there a reasonable probability that the outcome of the trial would have been different? See Strickland, 466 U.S. at 693-94, 104 S.Ct. at 2067-68. The answer is no. Even today, as Coleman faces execution, the name of this alleged witness has not been provided. We have only two affidavits from Coleman's relatives, stating that they spoke to this witness. Weighing this potential evidence, whose very existence is dubious, against the evidence produced at trial on Coleman's whereabouts at the time of the murders, we are unable to conclude that the alibi testimony would have altered the trial's outcome. See Wallace v. Lockhart, 701 F.2d 719, 730 (8th Cir.) (evidentiary hearing unnecessary when name of potential witness not provided), cert. denied, 464 U.S. 934, 104 S.Ct. 340, 78 L.Ed.2d 308 (1983).
 
 
 26
 Coleman argues that his attorney failed to file written briefs on certain motions and that he never requested additional time to file reply briefs. This court has held that the Sixth Amendment does not require that every possible motion be filed, but only those having a solid foundation. See United States v. Afflerbach, 754 F.2d 866, 870 (10th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 3506, 87 L.Ed.2d 636 (1985); United States v. Crouthers, 669 F.2d 635, 643 (10th Cir.1982). And an attorney's decision whether to file a written brief on a given motion is strategic. This is especially so when, as in the instant case, an attorney has only limited resources. The Strickland Court instructed reviewing courts to be "highly deferential" to strategic decisions of attorneys. 466 U.S. at 690-91, 104 S.Ct. at 2066-67. Accordingly, we find that the attorney's decision not to submit written briefs on each of the myriad motions made during trial was reasonable.[5]
 
 
 27
 Coleman next claims that his attorney failed to prepare adequately for the testimony of Eli Maghee, an inmate at the Tulsa County Jail who testified that Coleman admitted murdering the Sewards. Although Coleman's attorney did not attend the hearing at which Maghee testified, he was given a transcript of this hearing shortly after trial began. Coleman has now presented evidence suggesting that Maghee committed perjury.
 
 
 28
 Perhaps Coleman's attorney could have prepared more completely for this witness. Counsel did, however, call one witness who stated that Maghee was a liar. Other testimony would have been cumulative. Further, Maghee was only one of several witnesses the state used to prove that Coleman committed the murder and, with respect to sentencing, was likely to commit further crimes. This court must take notice of the virtually unchallenged evidence of Coleman's guilt. See Strickland, 466 U.S. at 695-96, 104 S.Ct. at 2068-69. We cannot conclude that the jurors would have reached a contrary decision with respect to guilt or sentence had they not heard the testimony of Maghee, or if that testimony had been more thoroughly discredited.
 
 
 29
 Coleman finally contends that his attorney erred in failing to request an instruction that a defendant's decision not to testify cannot be used against him. If a defendant requests an instruction on silence, it must be given. Carter v. Kentucky, 450 U.S. 288, 305, 101 S.Ct. 1112, 1121, 67 L.Ed.2d 241 (1981). A court is not obligated to so instruct, however, unless a request is made. Dutton v. State, 674 P.2d 1134, 1140 (Okla.Crim.App.1984). And whether to request a particular instruction is within an attorney's tactical discretion. See Bashor v. Risley, 730 F.2d 1228, 1241 (9th Cir.), cert. denied, 469 U.S. 838, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984). Here, counsel admitted that attorneys often decide not to request such an instruction because it calls attention to the defendant's silence. We do not find it improper that Coleman's attorney failed to request this instruction.
 
 B
 
 30
 With respect to the sentencing phase of the trial, the crux of Coleman's claim is that his attorney was unprepared; that counsel did not investigate other criminal charges pending against Coleman, which the state introduced as evidence of aggravating circumstances; and that counsel did not present any mitigating evidence.[6] Coleman contends that his attorney had "given up" and in closing argument separated himself from his client.
 
 
 31
 On the preparedness issue, even at this late date petitioner has not pointed to any specific evidence that investigation of the charges pending against him would have revealed. Without a showing that an investigation would have uncovered mitigating evidence, this court may not presume prejudice.
 
 
 32
 Similarly, Coleman asserts that his trial attorney should have had members of Coleman's family testify on his behalf. But during state hearings on post-conviction relief, Coleman's attorney responded to a question on the existence of mitigating evidence by saying, "You couldn't even put his family on." R. III, 97. This indicates that Coleman's attorney considered using such testimony but decided against it. Such a decision is well within the range an attorney is entitled to make. See Strickland, 466 U.S. at 690-91, 699, 104 S.Ct. at 2066-67, 2070; Mitchell v. Kemp, 762 F.2d 886, 890 (11th Cir.1985). The Strickland Court noted that when there is overwhelming evidence of both guilt and aggravating factors, testimony that the defendant is a "good" person is unlikely to alter the outcome of a sentencing proceeding. 466 U.S. at 700, 104 S.Ct. at 2071; see also Stanley v. Zant, 697 F.2d 955, 970 (11th Cir.1983), cert. denied, 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984).
 
 
 33
 In reaching the conclusion that Coleman has failed to prove prejudice, we emphasize that the jury found that five aggravating factors existed beyond a reasonable doubt, and Coleman has not challenged the validity of any of them. Only one aggravating factor is needed to allow the jury to consider the death penalty. Okla.Stat. tit. 21, Sec. 701.11. Coleman has not met his burden of proving that his attorney's failure to present mitigating evidence prejudiced his case.
 
 
 34
 Finally, Coleman claims that his attorney's closing argument in the sentencing stage of his trial was prejudicial. He focuses on isolated portions of the closing argument to argue that his trial attorney failed to "humanize" Coleman and that he disassociated himself from his client. See, e.g., King v. Strickland, 748 F.2d 1462, 1464-65 (11th Cir.1984) (attorney's focus on reprehensible nature of the crime and his court-appointed status were factors justifying reversal), cert. denied, 471 U.S. 1016, 105 S.Ct. 2020, 85 L.Ed.2d 301 (1985). But the closing argument here shows only an experienced criminal attorney's strategic decision to appeal to a jury's religious beliefs.[7] It was the plea for mercy the defendant himself chose not to make. Faced with overwhelming evidence of both guilt and aggravating factors, Coleman's attorney made a reasoned decision not to focus on Coleman's guilt or innocence but to appeal to the jury's merciful instincts. Counsel expressly testified that his closing argument was "intended to create some sympathy for a man who had been convicted of Murder One." R. III, 84.[8] A reviewing court cannot second guess the decisions of experienced trial attorneys. Strickland, 466 U.S. at 690-91, 104 S.Ct. at 2066-67; Darden, --- U.S. at ----, 106 S.Ct. at 2473. Viewing this closing argument as a whole, we hold that the argument did not prejudice Coleman.
 
 C
 
 35
 In determining that Coleman received effective assistance of counsel, we have focused not only on alleged errors, but also on what counsel did for Coleman. Courts should not judge the overall quality of representation by focusing unduly on isolated incidents. See Tucker v. Zant, 724 F.2d 882, 894 (11th Cir.1984), reversed on other grounds sub. nom. Tucker v. Kemp, 762 F.2d 1480 (11th Cir.1985) (en banc). Although certain individual errors may be so fundamental that they alone constitute reversible error, see Morrison, --- U.S. at ----, 106 S.Ct. at 2586-89, when a series of errors of lesser magnitude are asserted, a court should consider the quality of representation as a whole. Id. at ----, 106 S.Ct. at 2588.
 
 
 36
 Coleman's attorney was an experienced criminal lawyer who had participated in several other capital trials. Although the record shows he was beleaguered, he nevertheless vigorously defended Coleman. He succeeded in obtaining a change of venue and in excluding from the guilt stage of the trial testimony that Coleman had escaped from jail and that his brother had thrown the murder weapon into a river. See United States v. Winkle, 722 F.2d 605, 608-09 (10th Cir.1983). He made numerous objections and motions throughout the guilt and sentencing stages. Having reviewed the entire record, we are convinced this attorney was an effective advocate.
 
 IV
 
 37
 Coleman asserts that the trial court's refusal to appoint a private investigator to help his attorney violated his due process and equal protection rights. Oklahoma only permits courts in counties with populations greater than 200,000 to appoint private investigators to aid indigent defendants. Okla.Stat. tit. 19, Sec. 138.6. The trial court found that it had no authority to appoint an investigator because the trial was taking place in Muskogee County, which has fewer than 200,000 people.
 
 
 38
 We need not decide whether the Constitution requires appointment of a private investigator to aid in the defense's preparation for trial if the defendant makes no showing that the requested assistance would be beneficial. Caldwell v. Mississippi, 472 U.S. 320, ---- n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985). Other than the possible existence of one unnamed alibi witness, Coleman has alleged only that his attorney was overworked, that many witnesses were involved in the case, and that the state's resources far surpassed those of the defense.[9] These factors do not invariably preclude a defense attorney from rendering a reasonably effective defense. Cf. United States v. Cronic, 466 U.S. 648, 663, 104 S.Ct. 2039, 2049, 80 L.Ed.2d 657 (1984) (that government had more time to prepare case does not necessarily result in prejudice to defendant). Even if such general showings would have been sufficient before trial, they are insufficient post-trial. See Mason v. Arizona, 504 F.2d 1345, 1352-53 (9th Cir.1974); see also Caldwell, 472 U.S. at ---- n. 1, 105 S.Ct. at 2637 n. 1. We hold that Coleman has not demonstrated substantial prejudice from the lack of an investigator.
 
 V
 
 39
 * Coleman contends that, in the state's closing arguments during the trial's guilt stage, the state improperly (1) commented on Coleman's failure to testify; (2) told the jury they were the last link in the chain of law enforcement; (3) attempted to inflame the jury and evoke sympathy for the victim; and (4) commented on issues not in evidence.
 
 
 40
 In a habeas proceeding, our review of a state prosecutor's allegedly prejudicial remarks is limited. "A federal court does not have supervisory jurisdiction over state courts and may overturn a state court conviction only when a defendant's constitutional rights have been violated." Sanchez v. Heggie, 531 F.2d 964, 967-68 (10th Cir.) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)), cert. denied, 429 U.S. 849, 97 S.Ct. 135, 50 L.Ed.2d 122 (1976); accord Darden, --- U.S. at ----, 106 S.Ct. at 2472. Remarks that would cause us to reverse in a direct appeal of a federal conviction are not necessarily grounds for reversal when spoken in state courts. Brooks v. Kemp, 762 F.2d 1383, 1399 (11th Cir.1985) (en banc), vacated on other grounds, --- U.S. ----, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986); Cobb v. Wainwright, 609 F.2d 754, 755 (5th Cir.), cert. denied, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980). Further, to determine whether a state prosecutor's remarks were so flagrant as to deny a defendant a fair trial, we must take notice of all the surrounding circumstances, including the strength of the state's case. See United States v. Haskins, 737 F.2d 844, 850 (10th Cir.1984)); see also Darden, --- U.S. at ----, 106 S.Ct. at 2472.
 
 
 41
 In his closing argument during the guilt stage, the prosecutor asked: "Why did he leave at 3:15 with a .28 gauge shotgun in his hand? Why did he leave with the shotgun ...." R. VII, 832. He continued along these lines, prefacing bits of unanswered inculpatory evidence with the word "why." Coleman construes this as unconstitutional comment on his silence. Further, Coleman observes, the state commented on the "uncontradicted" evidence. Id.
 
 
 42
 In Knowles v. United States, 224 F.2d 168 (10th Cir.1955), we held that reversible error exists if a prosecutor's remarks were "manifestly intended or [were] of such character that the jury would naturally and necessarily take [them] to be a comment on the failure of the accused to testify." Id. at 170; accord United States v. Hooks, 780 F.2d 1526, 1533 (10th Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986). In Knowles, a tax fraud case, the prosecutor stated that the defendant "had every opportunity in the world given to make an explanation of it, to prove it was in error, to cast doubt upon it. And it wasn't done." Knowles, 224 F.2d at 170. We construed this as a comment on the fact that the evidence was unrefuted, not that the defendant failed to testify. Id.; see also United States v. Walton, 552 F.2d 1354, 1362-63 (10th Cir.) (statement that particular witness was the only one willing to testify did not violate Fifth Amendment), cert. denied, 431 U.S. 959, 97 S.Ct. 2685, 53 L.Ed.2d 277 (1977); Sanchez v. Heggie, 531 F.2d at 967 (statement that no one attempted to explain evidence did not violate Fifth Amendment). The remarks in the instant case were far more innocuous than those in Knowles. They were not "manifestly intended" to draw attention to Coleman's silence; they were no more than a rhetorical device.
 
 
 43
 The prosecutor also stated in closing argument in the guilt stage that, following the police, the witnesses, and the district attorney's office, the jury was the final link in the chain of law enforcement. We agree with Coleman that this "final link" statement was improper. By suggesting that the jury is only the last link in a long decision, the statement tends to trivialize the jury's importance. See Tucker v. Kemp, 762 F.2d 1480, 1485-86 (11th Cir.) (en banc) (finding similar argument improper at sentencing stage), vacated on other grounds, --- U.S. ----, 106 S.Ct. 517, 88 L.Ed.2d 452 (1985). This argument also misstates the role of the jury, placing it in an adversarial position with respect to the defendant. To the extent that the prosecutor's argument portrayed the jury as part of a team opposing the defendant, it was improper. But we do not find that this "last link" remark made during the guilt stage of the trial--even taken together with the prosecutor's persistent attempts to evoke sympathy for Coleman's victims and his comments on matters not in evidence--rose to the level of constitutional error.
 
 
 44
 Regarding Coleman's third argument, the Supreme Court recently has explained that an improper closing argument in the guilt stage of a capital case warrants reversal only if the "prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " Darden, --- U.S. at ----, 106 S.Ct. at 2472 (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). This standard was not met here. The prosecutor's improper comments generally were limited to the introduction of a lengthy closing argument. See United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985) (remarks must be viewed in context of entire record); United States v. Espinosa, 771 F.2d 1382, 1401 (10th Cir.1985) (same), cert. denied, --- U.S. ----, 106 S.Ct. 579, 88 L.Ed.2d 561 (1985). In view of the overwhelming evidence of defendant's guilt, they cannot be said to have violated Coleman's right to a fair trial.
 
 
 45
 The prosecutor also did not manipulate or misstate the evidence. Rather, many of the prosecutor's most graphic remarks were in fact accurate descriptions of the evidence. See Hance v. Zant, 696 F.2d 940, 951 (11th Cir.) ("unquestionably inflammatory" evidence accurately depicting scene of murder admissible), cert. denied, 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983), overruled on other grounds, Brooks v. Kemp, 762 F.2d 1383 (11th Cir.1985) (en banc).
 
 B
 
 46
 Coleman also contends that the prosecutor's closing remarks in the sentencing stage of his trial rendered it fundamentally unfair. The standard governing appellate review of closing arguments during the sentencing stage of capital cases is whether the comments might have affected the sentencing decision. See Caldwell v. Mississippi, 472 U.S. 320, ----, 105 S.Ct. 2633, 2644, 86 L.Ed.2d 231 (1985) ("Because we cannot say that this effort [improper comment] had no effect on the sentencing decision, that decision does not meet the standard of reliability that the Eighth Amendment requires." )
 
 
 47
 Death is qualitatively different from all other punishments, therefore "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). A decision on the propriety of a closing argument must look to the Eighth Amendment's command that a death sentence be based on a complete assessment of the defendant's individual circumstances, see Brooks v. Kemp, 762 F.2d 1383, 1406 (11th Cir.1985) (en banc), vacated on other grounds, --- U.S. ----, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), and the Fourteenth Amendment's guarantee that no one be deprived of life without due process of law, see Darden, --- U.S. at ----, 106 S.Ct. at 2472.
 
 
 48
 Some emotion is inevitable in capital sentencing. Brooks, 762 F.2d at 1404-05. Thus, appeals to emotion ordinarily do not alone render an argument improper. Id. at 1405 & n. 34; see also Darden, --- U.S. at ----, 106 S.Ct. at 2472 (emotional argument during guilt stage did not render trial fundamentally unfair). But, as we discuss below, even if a prosecutor's comments are confined to permissible subjects, if those comments are nevertheless designed to evoke a wholly emotional response from the jury, constitutional error can result.
 
 
 49
 With respect to the subjects that a prosecutor may address, comments are permissible only to the extent they are relevant to factors the jury may properly consider. Drake v. Kemp, 762 F.2d 1449, 1458 (11th Cir.1985) (en banc), cert. denied, --- U.S. ----, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986). Thus the prosecutor may comment on evidence concerning the existence of an aggravating factor the state statute requires to be found before the jury may impose the death penalty.[10] Brooks, 762 F.2d at 1408. The prosecutor also may comment on "information about the defendant, his character, and the circumstances of his offense made known to the jury throughout the bifurcated trial." Id. at 1406.
 
 
 50
 Comments on the defendant's future dangerousness and the chances for rehabilitation also are permissible. Id. at 1406-08 (citing Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976)); Drake, 762 F.2d at 1458. Similarly, comments concerning the penological justifications for the death penalty, i.e., retribution, incapacitation, and general deterrence, are appropriate. Brooks, 762 F.2d at 1407-08; Drake, 762 F.2d at 1458.
 
 
 51
 Here, Coleman alleges the prosecutor improperly gave his personal opinion on whether Coleman felt remorse for his actions, and commented on Coleman's future dangerousness. In addition, the prosecutor sought to shift responsibility for the death penalty from the jurors to Coleman. We address these in turn.
 
 
 52
 Coleman challenges the following statements of the prosecutor:
 
 
 53
 "Let's not even consider the ones that were killed, murdered, that we've proven to you, but the ones he tried to kill and murder. I just appeal to simple justice. In our Second Stage we showed you about the escape. We showed you what happened in five days. You talk about regret and remorse for what he did to John Seward. My gosh! Here we are 60 days later cutting Tommie Dotson's throat. Tells him 'I'm looking for a place to leave you for a while.' He's already stabbed him in the throat. He's bleeding to death, so he handcuffs his hands behind him, then throws him back of the patrol car, and then destroys any communication he can have with anybody by ripping all of the wires out. Do we have to tolerate that? That's on April 24th. That's the day after he escaped and he feels a lot of regret and remorse for what he did to John and Roxie Seward. And we can tell here--here he is a day later after he escaped--60 days after the murder. Tommie Dotson--what has he got to do with anything. He just stopped the man--but we need a gun so we stab him and put him in the back of the car with his hands handcuffed behind him. That's April 24th. On April 26th, two days later, now he's in Tulsa. He's in Tulsa and Billy Wilson told you what he saw. What have we got?"
 
 
 54
 R. VII, 1001-02 (emphasis added). Although Coleman's contention that the prosecutor should not give his personal opinion is correct, see Darden, --- U.S. at ----, 106 S.Ct. at 2477 (Blackmun, J., dissenting), we do not believe that occurred here. Instead, the quoted argument is directly relevant to the "probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society," one of the Oklahoma aggravating circumstances. Okla.Stat. tit. 21, Sec. 701.12(7). Coleman's failure to show regret or remorse for his actions may have helped the jury determine whether he was likely to commit crimes in the future. Thus these comments were not improper.
 
 
 55
 Coleman also challenges the prosecutor's remarks concerning his future dangerousness. He contends that Oklahoma law forbids such remarks. Oklahoma, however, permits such commentary as long as the defendant's future dangerousness is listed as an aggravating circumstance in the bill of particulars. Brewer v. State, 650 P.2d 54, 58 n. 1 (Okla.Crim.App.1982), cert. denied, 459 U.S. 1150, 103 S.Ct. 794, 74 L.Ed.2d 999 (1983). The state did include Coleman's future dangerousness as an aggravating circumstance in its bill of particulars, and thus was free under state law to argue that Coleman constituted a continuing threat. In addition, such comments are constitutionally appropriate. See Brooks, 762 F.2d at 1411-12. Comments on a defendant's future dangerousness are relevant to specific deterrence, one of the purposes of the death penalty.
 
 The prosecutor also stated:
 
 56
 "In closing I say to you that they try to put the responsibility on you, like it's all your fault. To a certain extent--I don't mean to imply, I don't mean to imply that it's put on you like it's your fault if you do something in this case. I don't mean to imply that necessarily, but let me make it real clear that you're not writing the verdict in this case. Don't--don't be mistaken into believing that it's your responsibility that this happened, that you're, you're writing the verdict. I, I say to you, this man wrote the verdict on February 9th, and all those days after when he got out of jail and went on [sic] spree of knifing and kidnapping and killing. He wrote the verdict. This man. He wrote it in blood over and over."
 
 
 57
 R. VII, 1018-19.
 
 
 58
 In Caldwell v. Mississippi, 472 U.S. at ---- - ----, 105 S.Ct. at 2638-46, the Supreme Court condemned somewhat analogous remarks which emphasized that appellate courts ultimately would determine the appropriate penalty. The Court concluded that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Id. at ----, 105 S.Ct. at 2638. It condemned such arguments because (1) it is the duty of the jury rather than an appellate court to impose the sentence; (2) the jury, believing that an appellate court will correct an error, may sentence the defendant to death even though they are not convinced this penalty is necessary; (3) jurors may conclude that a life sentence cannot be increased to death and impose the death penalty so that the appellate court can impose it if it so desires; and (4) the argument may be used as a means to obtain the votes of undecided jurors. Id. at ---- - ----, 105 S.Ct. at 2638-42.
 
 
 59
 We believe the dangers the Court identified in Caldwell are not present in the remarks made here. This method of argument does not permit the jury to rely on someone else to make the ultimate sentencing decision or otherwise dilute or trivialize the jury's responsibility. Unlike the argument in Caldwell, the argument used here did not suggest to the jury that someone else now has control over the defendant's fate. Instead, it only brought into focus that defendant is responsible for his own plight. See Brooks, 762 F.2d at 1410.
 
 
 60
 Moreover, viewing this argument in context, it is evident that the prosecutor had no intention of diminishing the jury's sense of responsibility.
 
 
 61
 "He [Coleman's attorney], he said something about, come out here, and I can't remember what he said. He said, you bring back the death penalty, come back here and slap everybody on the back and joke around--my gosh, folks! Let's don't take it that lightly. He makes it sound like it would be easy for you to do that.
 
 
 62
 I say to you the toughest thing you may do in your whole life--the toughest thing you may do in your whole life is to come back and do what you know you've got to do in this case.
 
 
 63
 And it will be something you'll pray about and think about forever. It won't be something you're popular about and want to joke about and run around to the coffee shop and barber shop to brag about it. It won't be. It will be one of the most serious things you've ever done in your life and it won't be easy. I don't care what he says. I know that it won't be. It's not easy to be here now. It's a grave responsibility you have. It's an important responsibility you have, and it's not easy to shoulder that kind of load, but somebody's got to. Somebody's got to. Somebody's got to stop what this man did. Somebody's got to take that responsibility.
 
 
 64
 Is it easy? No, it's not easy, but you've got to do it. If you don't, it just goes on and on and what are we just supposed to accept that? We've got to draw a line and stand for something."
 
 
 65
 R. VII, 1017-18. The prosecutor's argument that Coleman was responsible for his own plight thus was not improper.
 
 
 66
 We are disturbed by the tenor of some of the prosecutor's closing argument at sentencing.[11] Although discussion of the heinousness of the crime or the likelihood that the defendant will commit future violent acts will inevitably evoke some emotion, the prosecutor's primary role is to give the jury the facts necessary to decide if the death penalty is warranted. Prosecutorial playing on jurors' passion can only subvert the delicate process of preventing the arbitrary imposition of the death penalty, with which the courts have long struggled.
 
 
 67
 Nevertheless, we cannot conclude that the prosecutor's argument here was improper. Other courts have tolerated far more egregious arguments. See, e.g., Brooks, 762 F.2d at 1413 (prosecution's description of defendant as a "cancer on the body of society" not improper). Although the prosecutor's emotional argument came close to the line dividing proper from improper argument, we cannot conclude that he transgressed Coleman's Eighth or Fourteenth Amendment rights.
 
 VI
 
 68
 Coleman's final claim is that the district court erred in not granting him an evidentiary hearing. He contends he did not receive a full and fair hearing in state court because he was not permitted to testify at hearings conducted on his application for post-conviction relief. But Coleman has alleged only in the most general terms what he would have testified to had he been permitted to attend the state hearing. Most of his claims concern his counsel's alleged ineffectiveness. These general and conclusory assertions do not warrant an evidentiary hearing. See Tucker v. Zant, 724 F.2d 882, 897-98 (11th Cir.1984), aff'd, 762 F.2d 1480 (11th Cir.1985) (en banc); Wallace v. Lockhart, 701 F.2d at 730. Further, we are convinced by our review that the record was sufficient, without augmentation through an evidentiary hearing, to show that Coleman had effective counsel. See Pierce v. Cardwell, 572 F.2d 1339, 1343 (9th Cir.1978).
 
 
 69
 We AFFIRM the district court's denial of the writ of habeas corpus. In light of the fact that this is a capital case, following the consideration of any rehearing petition that may be filed, when the final order of this court is entered, or when the judgment becomes final without further order and issuance of the mandate of this court which would otherwise occur, we will stay our mandate and execution of petitioner's death warrant for thirty days pending the filing of a petition for certiorari in the Supreme Court of the United States; if such a petition for certiorari is filed within such time, then the stay of our mandate and of petitioner's execution will continue until disposition by the Supreme Court of the petition for certiorari.
 
 
 
 [1]
 We have noted a significant error, which we must discuss, in the district court's January 18, 1985 "Order Denying Petitioner's Application for Evidentiary Hearing, Denying Petition For Writ of Habeas Corpus, And Denying Petitioner's Application For Stay of Execution."
 At page 23 of that Order, the district court stated that "petitioner has filed a previous request for habeas corpus relief before the court in No. 80-312-C, which was denied by order of this court on December 22, 1980." The Order then quoted language from Barefoot v. Estelle, 463 U.S. 880, 895, 103 S.Ct. 3383, 3395, 77 L.Ed.2d 1090 (1983), about the State's legitimate interest in preventing a mere delaying tactic by abuse of the writ.
 The record before us shows that the prior case No. 80-312-C was not a habeas petition attacking the John Seward murder conviction and death sentence involved in the instant case. That case dealt instead with claims that the petitioner was denied his right to a speedy trial on the charge that he murdered Roxie Seward. Accordingly, the district court's statements about successive proceedings and the prior case were clearly in error.
 
 
 [2]
 In addition to dispensing with Witherspoon 's reference to "automatic" decisionmaking, the Witt Court eliminated the requirement that a juror's bias be shown with "unmistakable clarity." Witt, 469 U.S. at 419, 105 S.Ct. at 850. See generally Comment, Excluding Death Penalty Opponents from Capital Juries: Witt, Witherspoon, and the Impartial Juror, 34 U.Kan.L.Rev. 149 (1985)
 
 
 [3]
 The trial judge has the power, and indeed the duty, to ask his own questions to explore the depth of a juror's convictions regarding imposition of the death penalty. See Witt, 469 U.S. at 419, 105 S.Ct. at 850; Darden, --- U.S. at ----, 106 S.Ct. at 2469. Had the juror indicated that he could impose the death penalty in an exceptional case, the trial judge could have found the juror qualified under the Witt standard. The record reveals that Coleman's attorney made no attempt to question these jurors. He did, however, take strong exception to the excusing of each of these four jurors by various motions and comments
 
 
 [4]
 On appeal, Coleman offered two affidavits by his relatives stating that they had talked to the woman and that she said she saw Coleman at his brother's house during the time the crimes were committed. The relatives further stated that they had conveyed this information to Coleman's attorney prior to trial
 
 
 [5]
 Coleman specifically notes his attorney's failure to brief the question whether Jeanette Coleman's testimony fell within the husband-wife privilege. But the Oklahoma Court of Criminal Appeals affirmed the trial court's decision to admit this testimony. Coleman v. State, 668 P.2d 1126, 1134 (Okla.Crim.App.1983). We therefore cannot find that Coleman's attorney's decision not to brief this issue may have altered the trial's outcome
 
 
 [6]
 Oklahoma requires a jury to find the existence of an aggravating circumstance before it may consider imposing the death penalty. Okla.Stat. tit. 21, Sec. 701.10-.12. In this case, the jury found the following aggravating circumstances:
 "1. The Defendant was previously convicted of a felony involving the use or threat of violence to the person;
 
 
 [2]
 The Defendant knowingly created a risk of death to more than one person;
 
 
 [3]
 The Murder was especially heinous, atrocious or cruel;
 
 
 [4]
 The Murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution;
 
 
 [5]
 There exists a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society."
 R. IV, 195.
 Oklahoma law, as it must, also permits the introduction of mitigating evidence. Okla.Stat. tit. 21, Sec. 701.10.
 
 
 [7]
 This appears to be a common trial tactic. See Caldwell v. Mississippi, 472 U.S. 320, ----, 105 S.Ct. 2633, 2637, 86 L.Ed.2d 231 (1985)
 
 
 [8]
 The Supreme Court recently has granted certiorari in a case challenging a jury instruction that a jury must not consider sympathy in deciding whether to impose the death penalty. California v. Brown, --- U.S. ----, 106 S.Ct. 2274, 90 L.Ed.2d 717 (1986). Although a similar instruction was given in the instant case, R. VII, 993, we cannot consider this issue. It has not been raised either here or in the state courts. Such an issue must be presented to the state courts before it may be treated in federal proceedings. See Crisp v. Mayabb, 668 F.2d 1127, 1132 (10th Cir.1981), cert. denied, 459 U.S. 827, 103 S.Ct. 62, 74 L.Ed.2d 64 (1982); Drennon v. Hess, 642 F.2d 1204, 1205 (10th Cir.1981); L. Yackle, Postconviction Remedies Sec. 67, at 285-86 (1981)
 
 
 [9]
 The only specific evidence that Coleman has brought to the court's attention are reports suggesting that one of the state's witnesses may have committed perjury. As discussed above, we do not believe that introduction of this evidence would have altered the outcome of either stage of the trial
 
 
 [10]
 Both Georgia and Oklahoma require the jury to find the existence of at least one statutorily designated aggravating factor before it may consider imposing the death penalty. See Ga.Code Sec. 17-10-30; Okla.Stat. tit. 21, Sec. 701.11. But regardless of how many aggravating factors are found, the jury may decline imposition of the death penalty. Okla.Stat. tit. 21, Sec. 701.11, Brooks, 762 F.2d at 1405
 
 
 [11]
 The following is an example of the prosecutor's playing to the jury's emotions while commenting on permissible subjects:
 "I talked to you about one thing--not vengance, not even punishment. I talked about one word--PROTECTION. And nobody tells us, Scriptures or otherwise--nobody tells us we don't have the right to protect ourselves. He talks about family. Why didn't he ask them? Why didn't he ask Mrs. Warren how she felt? She's a Christian lady. Why didn't he ask her how she felt about this and what her understanding of her religion was? Why didn't he ask Mr. Parish when he took the witness stand? Why didn't he ask those people? If he wants to get up here and tell you that those people didn't feel that way, then why didn't he ask them when they sat right up there, you know, why didn't he ask them?
 Because they're Christian, God-fearing people! That they also want to be protected from being like a sheep. Like a sheep at the hands of that man, being marched down to slaughter. Being thrown in a ravine. PROTECTION. I'm not talking vengance. I'm not talking punishment. We've got to do something to protect ourselves from something that kills so callously, that kills so senselessly, and I'm not saying 'No big deal,' I'm saying that's how he felt about life.
 The gun's more important--a gun is more important. The groceries are more important.
 I say to you, ladies and gentlemen of the Jury, we've got to do something. We've got to do something to make sure that this range of five days doesn't happen again."
 R. VII, 1015-16 (original emphasis).