Felix MARTINEZ, Petitioner–Appellant,

v.

George SULLIVAN,
Respondent–Appellee.

No. 87–1534.

United States Court of Appeals,
Tenth Circuit.

Aug. 4, 1989.

Peter Schoenburg, Asst. Federal Public Defender, Albuquerque, N.M. (Tova Indritz, Federal Public Defender, Albuquerque, N.M., was also on the brief), for petitioner-appellant.

Katherine Zinn, Asst. Atty. Gen., Santa Fe, N.M. (Hal Stratton, Atty. Gen., Santa Fe, N.M., was also on the brief), for respondent-appellee.

Before HOLLOWAY, Chief Judge, and SEYMOUR and EBEL, Circuit Judges.

HOLLOWAY, Chief Judge.

Petitioner Felix Martinez appeals from the district court's order dismissing his petition for a writ of habeas corpus. We affirm.

I

On the evening of August 1, 1981, Scott Thompson, a prisoner at Camp Sierra Blan-ca in New Mexico, was stabbed and beaten to death. Fellow prisoners Lujan, Sedillo, and petitioner Martinez were charged by the State of New Mexico with capital murder. Martinez was twice tried alone. Both trials resulted in mistrials. At his third trial, Lujan and Martinez were tried together. Sedillo, who had previously plead guilty to second degree murder, testified for the defense that he alone was responsible for Thompson's murder. Martinez also testified. He admitted only having a minor fracas with Thompson in their dorm and pushing him out the back door; he denied having anything to do with Thompson's death. Lujan was acquitted. Martinez was found guilty of second degree murder.

The New Mexico Court of Appeals affirmed Martinez' conviction. *State v. Martinez*, 102 N.M. 94, 691 P.2d 887 (Ct.App. 1984). The New Mexico Supreme Court denied certiorari. *Martinez v. State*, 102 N.M. 88, 691 P.2d 881 (1984). Martinez then petitioned the United States District Court for the District of New Mexico for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court adopted the magistrate's proposed findings and recommended disposition and dismissed with prejudice Martinez' petition. Martinez appeals.

In this appeal Martinez raises the same constitutional issues he presented in the New Mexico courts and in the federal district court by his habeas petition. He claims: (1) admission of Sam Love's preliminary hearing testimony violated his Sixth and Fourteenth Amendment right to confront witnesses against him because Love was not unavailable; (2) admission of codefendant Lujan's out-of-court declarations under the excited utterance and present sense impression exceptions to the hearsay rule violated his Sixth and Fourteenth Amendment right to confront Lujan; (3) admission of codefendant Lujan's out-of-court declarations under the co-conspirator exception to the hearsay rule also violated his right to confront Lujan because there was insufficient evidence of a conspiracy;

(4) a conflict of interest under which his attorney labored deprived him of his Sixth and Fourteenth Amendment right to effective assistance of counsel; (5) exclusion of jurors who under no circumstances would impose the penalty of death violated his Sixth and Fourteenth Amendment right to a jury selected from a fair cross-section of the community; and (6) denial of severance of his trial from Lujan's violated his Fourteenth Amendment right to due process of law.

## II

### 1. Unavailability of Witness Love

Sam Love, a witness to Thompson's murder, testified for the prosecution at Martinez' preliminary hearing and second trial. II R. 70–209; V R. Transcript of Testimony of Sam Love, Jr. At the preliminary hearing, Love testified he saw Martinez, Lujan, and Sedillo "whipping on another dude." II R. 75. Shortly afterwards, Love looked out his bathroom window and saw someone lying face down. Sedillo was hitting the person in the head with a pool cue and Martinez was kicking him. II R. 80–82. Later, Love saw Martinez enter the lodge with blood on his forearm. II R. 87. When Love failed to appear at Martinez' third trial, the prosecution introduced his preliminary hearing testimony. VI R. 1366.

■ Martinez contends that admission of Love's preliminary hearing testimony violated his Sixth and Fourteenth Amendment right to confront Love. The Sixth Amendment's Confrontation Clause, made applicable to the States through the Fourteenth Amendment, *Pointer v. Texas,* 380 U.S. 400, 403–06, 85 S.Ct. 1065, 1067–69,

13 L.Ed.2d 923 (1965), provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." If applied literally, the Confrontation Clause would require the exclusion of any statement made by a declarant not present at trial. Nevertheless, an out-of-court statement by a declarant who does not testify at trial is admissible against an accused if two conditions are satisfied. "[W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). As with other evidentiary proponents, the prosecution bears the burden of establishing the predicate of unavailability. *Id.* at 74–75, 100 S.Ct. at 2543–44.

■ Martinez contends the prosecution did not establish the first predicate; he asserts it failed to show Love was unavailable. "[A] witness is not 'unavailable' for purposes of the ... exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Barber v. Page,* 390 U.S. 719, 724–25, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968). "The lengths to which the prosecution must go to produce a witness ... is a question of reasonableness." *Ohio v. Roberts,* 448 U.S. at 74, 100 S.Ct. at 2543 (*quoting California v. Green,* 399 U.S. 149, 189 n. 22, 90 S.Ct. 1930, 1951 n. 22, 26 L.Ed.2d 489 (1970) (Harlan, J., concurring)).[1]

---

**1.** The dissent would adopt a per se rule requiring use of the Uniform Act in all cases as a necessary prerequisite to a finding of unavailability for purposes of the Confrontation Clause. We think this rule would be contrary to decisions of the Supreme Court. The Court has said that "a witness is not 'unavailable' ... unless the prosecutorial authorities have made a good

faith effort to obtain his presence at trial." *Barber v. Page,* 390 U.S. 719, 725, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968). The Court has also said that "[t]he lengths to which the prosecution must go to produce a witness ... is a question of reasonableness." *Ohio v. Roberts,* 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980). We think that deciding whether a pros-

Love was to have arrived in New Mexico on September 8 when Martinez' trial began. VI R. 1291. The state trial court held a hearing on September 15 to determine whether Love was unavailable. VI R. 1287–1348. The prosecution presented testimony that it had employed the same procedure to obtain Love's appearance that had proved successful at Martinez' two previous trials. VI R. 1290. First, the prosecution served Love with a witness subpoena, through his Oklahoma parole officer, approximately one month before trial. VI R. 1290–91, 1316. Although the New Mexico subpoena had no legal authority in Oklahoma, where Love resided, he had twice responded to similar subpoenas. VI R. 1290, 1313. Second, the prosecution purchased an airplane ticket to New Mexico for Love and mailed him a travel itinerary. VI R. 1291. Finally, the prosecution telephoned Love twice, once approximately eleven days before trial and again the day before trial. VI R. 1290–91. Love confirmed he would appear to testify.

Love, however, did not appear. As the New Mexico prosecution in Martinez' trial was aware, Love had been released on bond in Oklahoma pending his trial on an unrelated criminal charge. Unknown to them, however, Love's trial was scheduled to begin in Oklahoma on September 8, the same day he was to testify at Martinez' trial in New Mexico. But the Oklahoma authorities were aware that Love was scheduled to testify at Martinez' trial in New Mexico, and so had anticipated they would obtain a continuance of Love's trial. VI R. 1292. Nevertheless, at Love's request his trial in Oklahoma began on September 8. VI R. 1292. Love was present at his trial during the morning session, but he did not return in the afternoon. VI R. 1293. When the prosecution in Martinez' trial learned Love had disappeared, it procured a subpoena that same day pursuant to the New Mexico version of the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings, N.M.Stat.Annot. § 31–8–3. VI R.

1293–1294. Three certified copies of the request for Love to be detained and held for a New Mexico officer to bring him to the trial were sent to the Clerk of the Oklahoma City District Court and three certified copies were likewise sent to the Sheriff's Department, all by Federal Express overnight service. VI R. 1294. Oklahoma has adopted the Act and so enforces such subpoenas. 22 Okla.Stat.Annot. § 722. Although seven days passed between September 8, when the New Mexico prosecution learned Love had disappeared, and September 15, when the New Mexico trial court held the hearing on his unavailability, the record contains no evidence that the New Mexico prosecution took further steps to locate Love during that time. As of September 15, when the state trial court held the hearing on his unavailability, Love had not been located.

The state trial court found "that the State has made a reasonable good faith effort to procure the attendance of the witness Sam Love.... I find that the unavailability of the witness, and the reasonable good faith efforts to procure his attendance, creates an exception to the sixth amendment right." VI R. 1346. The court further ruled that Martinez could introduce extrinsic evidence of Love's conviction in the Oklahoma trial mentioned above and of an alleged incident in which Love stole some jewelry. These events occurred after Martinez' second trial and so the court felt "there would be fundamental unfairness in the presentation of the ... transcript without allowing this extrinsic evidence." VI R. 1347. The court also allowed Martinez to introduce the transcript of Love's testimony at Martinez' second trial to establish prior inconsistent statements. VI R. 1347.

The New Mexico Court of Appeals ruled that the prosecution had exercised due diligence in attempting to obtain Love's presence and that he was unavailable as a witness. *Martinez,* 691 P.2d at 888–890. In federal habeas proceedings we must presume factual determinations by state

ecutor's efforts are "reasonable" and in "good-faith" requires us to consider all the circumstances rather than to apply a per se rule.

courts to be correct, unless an enumerated exception applies. 28 U.S.C. § 2254(d); *Sumner v. Mata*, 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982). However, here we are concerned with both the factual determinations of the New Mexico courts and their ultimate conclusion that Love was unavailable for Confrontation Clause purposes. Unavailability has been viewed as a mixed question of fact and law. *Burns v. Clusen*, 798 F.2d 931, 941–42 (7th Cir.1986). This court has discussed the issue of unavailability under the rubric of § 2254(d). *See Ewing v. Winans*, 749 F.2d 607, 609 (10th Cir.1984); *Valenzuela v. Griffin*, 654 F.2d 707, 710–11 (10th Cir.1981). In these cases, however, it does not appear that we were presented with the issue whether unavailability of a witness and a good faith effort to obtain his attendance at trial are factual determinations under § 2254(d) or mixed question of law and fact.[2]

■ In the instant case the parties agree that the question is a mixed question of fact and law, reviewable *de novo*. We are persuaded by the analysis of the Seventh Circuit in *Burns v. Clusen*, 798 F.2d at 940–942, that this position is correct. *Burns* held that while the presumption of correctness applies to the basic, primary, or historical facts, the ultimate issue of unavailability for purposes of the Confrontation Clause is a mixed question of fact and law, reviewable *de novo*. *See also Dres v. Campoy*, 784 F.2d 996, 998 (9th Cir.1986); *Rosario v. Kuhlman*, 839 F.2d 918, 923 n.

3 (2d Cir.1988). This rationale follows the reasoning in *Cuyler v. Sullivan*, 446 U.S. 335, 341, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980), which treated basic, primary, and historical facts as determinations entitled to the § 2254(d) presumption, but viewed an ultimate holding on multiple representation and effectiveness of counsel as a mixed determination of law and fact open to plenary federal review on collateral attack. *Id.* at 342, 100 S.Ct. at 1714. Thus, the determinations of a good faith effort to obtain a witness' presence and his unavailability, *Barber v. Page*, 390 U.S. at 724–25, 88 S.Ct. at 1321–22, are mixed questions of fact and law, reviewable *de novo*.

■ Considered in this light, we think the factual determinations that Love was absent, that the New Mexico prosecution took several steps to obtain his presence at trial, and that he failed to appear at the New Mexico trial are fairly supported by the record. VI R. 1345–1348. The ultimate conclusion of the New Mexico Court of Appeals of due diligence by the prosecution and of Love's unavailability, *Martinez*, 691 P.2d at 888–90, we likewise accept. Viewing this as a ruling on a mixed question, we hold it is correct under the constitutional requirements of the Confrontation Clause.[3] The indicia of reliability of the prior testimony are not challenged, and the determination of unavailability was proper; thus the requirements of the Confrontation Clause were met. *Mancusi v. Stubbs*, 408

2. Insofar as our holding below may modify recognition of a rule adopted under § 2254(d) in *Ewing* and *Valenzuela*, we are authorized to state that the full court approves our holding today that the determinations of unavailability of a witness and a good faith effort to obtain his attendance at trial are mixed questions of fact and law, reviewable *de novo*.

3. The dissent would hold that under the totality of the circumstances of this case the prosecution's efforts to obtain Love's presence at trial were not reasonable and in good faith. The dissent primarily relies on three factors to reach this conclusion: (1) Love had been arrested in Oklahoma after the second trial; (2) Love had skipped bond before; and (3) Love had a reputation and history of dishonesty.

Regarding Love's arrest, it is significant that the Oklahoma authorities had full knowledge of

Love's prior acts and the consequences to him of the Oklahoma charge. Nevertheless, they allowed him to remain free on bond. We think this undercuts the notion that the New Mexico authorities should have suspected Love would skip bond in Oklahoma. As to Love's prior bond skipping and unsavory reputation, we think it is significant that these factors were present before the first and second trials. Love, nevertheless, appeared voluntarily. Finally, we stress that the issue before us is not whether the New Mexico authorities made a mistake. With hindsight, we know that is true. The issue is whether they made a reasonable and good-faith effort to obtain Love's presence at trial. We think that considering all the circumstances, we canot say there was not a reasonable effort, in good faith. *See State v. Chapman*, 655 P.2d 1119, 1123–24 (Utah 1982).

U.S. 204, 216, 92 S.Ct. 2308, 2314, 33 L.Ed.2d 293 (1972).

### 2. Excited Utterance

Fellow inmate Garza testified regarding the events leading up to Thompsons's murder. VI R. 844–914. Early on the day of Thompson's murder, Martinez asked Garza if he knew who Martinez' new roomate was. Garza replied, "It's a white man." Martinez said, "I don't want him here. I'm going to take him out." VI R. 879. Later about 10:00 p.m., Garza entered the lounge of the building where he lived with Thompson and Martinez. VI R. 847. Garza sat down next to Thompson and the two began talking. VI R. 847, 870. Lujan was also present. VI R. 875. Soon Martinez entered and approached Thompson saying, "I told you I don't want you in my room. You punk." VI R. 871.

Martinez and Thompson began arguing. VI R. 872. Sedillo arrived and asked Garza, "What's happening?" Sedillo urged Martinez, "Do something if you're going to do it." VI R. 873. Sedillo then approached Thompson and poked him twice in the shoulder with a laundry pin and kicked him. VI R. 858. Martinez hit Thompson. VI R. 896. Thompson covered himself and began crying and said, "Please don't hit me." VI R. 912. Sedillo ordered Garza to watch the door, but Garza slipped out of the lounge and into his room. VI R. 875.

About five minutes later Lujan entered Garza's room. Garza testified: "[Lujan] said, 'They're going to rape him.' That they had taken him outside. And then I said, 'No, they're going to kill him.' And then he [Lujan] added, 'I believe so.'" VI R. 892. Martinez contends that through Garza's testimony, Lujan became a witness against him. Martinez asserts that admission of Lujan's statements violated his

Sixth and Fourteenth Amendment right to confront witnesses against him because Lujan exercised his Fifth Amendment privilege not to testify.

At trial Lujan's statement was admitted over Martinez' timely objection, directly against Martinez. It was admitted under the New Mexico hearsay rule's[4] present sense impression and excited utterance exceptions.[5] Martinez' attorney objected when the prosecution asked Garza to repeat what Lujan said. VI. R. 879–880. At the request of Martinez' attorney, Garza was questioned outside the presence of the jury regarding the foundation for the hearsay exceptions. VI R. 881, 884–891. Finally, the state trial judge ruled: "The court finds that the matter falls within the exceptions set forth in 803(1) or (2) [sic] . . . ." VI R. 891. These exceptions are the present sense impression and excited utterance exceptions to the hearsay rule. N.M. R.Evid. 803.

The New Mexico Court of Appeals, however, concluded that Lujan's statement had been admitted only against Lujan, not against Martinez. It held that because Lujan's statement did not explicitly name Martinez, an instruction admonishing the jury to consider the statement only against Lujan, and not against Martinez, would have adequately protected Martinez from prejudice. The New Mexico Court of Appeals held that "[h]aving failed to request [a limiting jury instruction], defendant cannot now be heard to complain." *Martinez,* 691 P.2d at 893.

▪ The New Mexico Court of Appeals' determination that Lujan's statement was admitted only against Lujan, and not against Martinez, cannot be reconciled with the trial record. The state trial judge seems clearly to have intended the admission of Lujan's statement to be against

---

4. N.M. R.Evid. 802 provides: Hearsay is not admissible except as provided by these rules or by other rules adopted by the supreme court or by statute.

5. N.M. R.Evid. 803 provides in part:
 The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(A) Present sense impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.

(B) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

Martinez, as well as Lujan, due to his express reliance on the excited utterance and present sense impression hearsay exceptions. If Lujan's statement was admitted only against Lujan, it was not hearsay. N.M. R.Evid. 801 provides, among other things, that "[a] statement is not hearsay if ... [t]he statement is offered against a party and is ... his own statement...." Thus the only possible reason for the state trial court's reliance on the hearsay exceptions is that Lujan's statement *was* being admitted against Martinez. Moreover, because Lujan's statement was being admitted directly against Martinez, it made no sense for his attorney to request an instruction limiting the statement to Lujan. Therefore, we cannot follow the analysis of the New Mexico Court of Appeals that there was a procedural default by Martinez' attorney.

The federal district court also presumed that Lujan's statement had been admitted only against Lujan, not against Martinez. The court held that admission of Lujan's statement did not violate Martinez' confrontation right because the statement was only "linkage evidence." [6]

■ While we agree that admission of Lujan's statement did not violate Martinez' rights under the Confrontation Clause, our reasons differ. As noted, admission of a hearsay statement is permissible under the Confrontation Clause if the declarant is unavailable and the statement bears adequate indicia of reliability. We hold that both conditions were met here. First, Lujan was unavailable within the meaning of the Confrontation Clause because he invoked his right not to testify. Second, although the statement must bear adequate indicia of reliability, "[r]eliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." *Ohio v. Roberts*, 446 U.S. at 66, 100 S.Ct. at 2539.[7]

■ The admissibility of spontaneous utterances—one ground relied on by the state trial court—was recognized by the Supreme Court over a century ago in *Insurance Co. v. Mosley*, 75 U.S. (8 Wall.) 397, 406–07, 19 L.Ed. 437 (1869) (decedent's spontaneous utterances shortly after injury part of *res gestae* and admissible to show cause of death). Wigmore documents the evolution of the spontaneous exclamation as a separate exception to the rule against hearsay. *Wigmore on Evidence*, §§ 1745–1757 (Chadbourn ed. 1976). The Advisory Committee's notes on the proposed Federal Rules of Evidence remark that "it finds support in cases without number." Fed.R. Evid. 803 Advisory Committee's notes. We are persuaded that the "excited utterance" exception to the hearsay rule is firmly enough rooted in our jurisprudence so that reliability can be inferred within the rationale of *Roberts*.

■ We agree with the state trial court's determination here that Lujan's statement was admissible against Martinez as an excited utterance. Garza had previously testified about the fracas he and Lujan witnessed in the lounge approximately five minutes before Lujan entered Garza's room. Garza further testified that when Lujan entered his room "he seemed like he was scared." VI. R. 890. In light of this

---

**6.** The New Mexico Court of Appeals and the federal district court used the reasoning that Lujan's statement was merely linkage evidence, not involving the risks of directly incriminating statements coming within *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Linkage evidence is evidence admitted against one codefendant which only indirectly implicates a codefendant against whom the evidence was neither admissible nor admitted. *Cf. Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 1707–08, 95 L.Ed.2d 176 (1987); *United States v. Markopoulos*, 848 F.2d 1036, 1038–39 (10th Cir.1988). However here Lujan's statement was directly admitted against Martinez, and the linkage analysis is improper.

Moreover, we do not decide whether the statement in question merely indirectly incriminated Martinez.

**7.** *See e.g., Bourjaily v. United States*, 483 U.S. 171, 183, 107 S.Ct. 2775, 2783, 97 L.Ed.2d 144 (1987) (co-conspirator's statements); *Mattox v. United States*, 146 U.S. 140, 151, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892) (dying declarations); *Mancusi v. Stubbs*, 408 U.S. 204, 213–16, 92 S.Ct. 2308, 2313–15, 33 L.Ed.2d 293 (1972) (cross-examined prior-trial testimony); *Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895) (cross-examined preliminary hearing testimony of deceased witness).

testimony, we think the state trial judge's determination that Lujan's statement was admissible as an excited utterance was fairly supported by the record. Thus both the unavailability of the declarant and the indicia of reliability of his statement were established.

We hold that the admission of Lujan's statement did not violate Martinez' rights under the Confrontation Clause.

### 3. Co-conspirator's Statement

During his trial testimony, fellow inmate Andrew Mitchell recounted a conversation he had with Lujan and Martinez about preparing a false affidavit to exculpate them. The state trial court admitted Lujan's statements during this conversation directly against Martinez under the co-conspirator exception to the hearsay rule.[8] VI R. 1206.

The state trial court found: "Under the proffer, the State has established, for evidentiary purposes, a common scheme or plan, a conspiracy to prepare and publish that affidavit." VI R. 1206. The New Mexico Court of Appeals affirmed. It summarized the evidence and found: "This evidence, particularly defendant's statement that the three should not get together to execute the statement, shows a combination between defendant, Lujan, and Mitchell to create and execute the false statement." *Martinez*, 691 P.2d at 891.

 Martinez does not contend that admission of Lujan's statement under the co-conspirator exception would have violated his rights under the Confrontation Clause if these findings by the state courts were correct. As discussed above, out-of-court statements are admissible against the accused if the declarant is unavailable and the statements bear adequate "indicia of reliability." *Ohio v. Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539. Unavailability is not required, however, when the statement is the out-of-court declaration of a co-conspir-

ator. *United States v. Inadi*, 475 U.S. 387, 399–400, 106 S.Ct. 1121, 1128–29, 89 L.Ed.2d 390 (1986). Further, no independent inquiry into reliability is required when the statement falls within the co-conspirator exception to the rule against hearsay. *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144 (1987).

 Martinez contends, however, that admission of Lujan's statement violated his rights under the Confrontation Clause because the state courts' findings were incorrect. Martinez says that we should not presume these factual determinations to be correct because they are not fairly supported by the record. *See* 28 U.S.C. § 2254(d)(8). We disagree.

The New Mexico Court of Appeals summarized the evidence that it thought was sufficient to establish a conspiracy between Martinez, Lujan, and Mitchell. *Martinez*, 691 P.2d at 891. The summary is an accurate reflection of the record and fairly supports the determination that there was sufficient evidence of a conspiracy between Martinez, Lujan, and Mitchell to admit Lujan's statements against Martinez under the co-conspirator exeption to the hearsay rule. Thus the admission of Lujan's out-of-court statements did not violate Martinez' rights under the Confrontation Clause.

### 4. Effectiveness of Assistance of Counsel

 Martinez contends he was denied his Sixth and Fourteenth Amendment right to effective assistance of counsel because his attorney labored under a conflict of interest.

Martinez asserts that his and Lujan's attorneys should be considered as one attorney. Mitchell represented Martinez; Wall represented Lujan. III R. 41. Before trial, Mitchell and Wall became law partners. III R. 41–42. They cooperated in preparing their clients' defenses. III R.

---

8. N.M. R.Evid. 801(D) provides:
 A statement is not hearsay if:
 . . . .
 (2) The statement is offered against a party and is

(e) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

42–43. During the hearing on Martinez' motion for a new trial Mitchell testified:

> After the motion to consolidate [Martinez' and Lujan's] trials, we proceeded to prepare. Everything was open. Wall brought his files over. I had all our files. They were all combined. We went through them time and time again, and interviewed witnesses, read transcripts, the whole works, together....

III R. 42–43. Under these circumstances, we will assume without deciding that the two law partners are appropriately considered as one attorney. *Cf. Burger v. Kemp*, 483 U.S. 776, 783, 107 S.Ct. 3114, 3120, 97 L.Ed.2d 638 (1987).

The Sixth Amendment's right to counsel, made applicable to the States through the Fourteenth Amendment, *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), provides: "In all criminal prosecutions, the accused shall enjoy the right to ... have the Assistance of Counsel for his defence." This guaranty includes the right to counsel's effective assistance. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970).

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Court adopted a two-part test for determining whether a criminal defendant's representation was constitutionally ineffective. First, the defendant must show that counsel's performance was deficient—that is, "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064. Second, he must show this deficiency prejudiced his defense—that is, "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068; *Coleman v. Brown*, 802 F.2d 1227, 1233 (10th Cir.1986), *cert. denied*, 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987).

However, because it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests, prejudice is presumed if "the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance." *Kemp*, 483 U.S. at 783, 107 S.Ct. at 3120. If, therefore, Martinez can demonstrate Mitchell and Wall actively represented conflicting interests, and that an actual conflict of interest adversely affected his counsel's conduct of his defense, we must presume he was thereby prejudiced. To this end, Martinez refers to two situations which arose during trial in which he asserts his and Lujan's interests conflicted.

First, as discussed above, Sam Love's preliminary hearing testimony was admitted against Martinez. That testimony was in some ways inconsistent with Love's testimony at Martinez' second trial. VI R. 1357–1358. Therefore, Mitchell, representing Martinez, wanted to introduce Love's trial testimony to impeach Love's credibility. VI R. 1357–1358. Wall, representing Lujan, on the other hand, did not want Love's trial testimony admitted. VI R. 1357–1358. At this juncture Martinez' and Lujan's interests conflicted, and Mitchell and Wall actively represented those conflicting interests. This was obviously a serious conflict of interest problem under the Sixth Amendment. Moreover, if Lujan had been convicted and raised the conflict issue, he would have a very serious claim of constitutional error.

However, Mitchell's representation of Martinez was not actually adversely affected. He urged the admission of Love's trial testimony and after argument for and against admission by the two attorneys the state trial judge ruled in favor of Mitchell. He allowed Mitchell to introduce Love's trial testimony; Martinez' interests prevailed. VI R. 1347. Thus, any loyalty that Mitchell felt toward Lujan did not adversely affect his representation of Martinez under the *Kemp* test.

Second, as discussed above, Lujan's out-of-court statements were admitted against Martinez. Martinez argues that admission of Lujan's statements created for his attorney a conflict of interest. Mitchell wanted Lujan to testify and subject himself to cross-examination regarding the state-

ments; Wall advised Lujan not to testify because it would allow introduction of his prior crimes to impeach his credibility. III R. 29. In the end, Lujan exercised his right not to testify.

Martinez asserts Mitchell and Wall actively represented his and Lujan's conflicting interests in the process of Lujan's decision. Lujan however was entitled to invoke his right not to testify. The magistrate's finding adopted by the district court, stated "once Lujan had decided not to testify, there was no way that [Martinez] could have required [Lujan] to testify, separate counsel or not." We agree.

Martinez has failed to establish grounds for a presumption of prejudice because he has not shown that his attorney actively represented conflicting interests which adversely affected his performance. He also has failed to establish actual prejudice. Consequently, his ineffective assistance of counsel claim fails.

### 5. The Witherspoon Excludables

■ Martinez' claim that removal for cause of "*Witherspoon*-excludables" violated his Sixth and Fourteenth Amendment right to a jury selected from a fair cross-section of the community is foreclosed by *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *Coleman v. Brown*, 802 F.2d at 1233.

### 6. Denial of Severance

■ Martinez' claim that denial of severance of his trial from that of Lujan violated his right to due process of law under the Fourteenth Amendment is based upon his arguments that Lujan's out-of-court statements were improperly admitted. We have rejected those arguments. The joint trial did not violate Martinez' right to due process.

Accordingly the judgment is

AFFIRMED.

SEYMOUR, Circuit Judge, dissenting.

Although I agree with the majority in all other respects, I respectfully dissent from its view that the prosecution acted in good faith in attempting to secure the presence of witness Sam Love, and that Love was "unavailable." I am convinced that Felix Martinez was impermissibly deprived of his Sixth Amendment confrontation right, and I would grant his habeas petition contingent upon the State of New Mexico's decision to conduct a new trial.

My concern about the majority's treatment of the unavailability issue is twofold. First, its presentation of the facts does not include record evidence demonstrating Love's unreliability and supporting Martinez' argument that the prosecution should not have relied on Love's prior cooperation or his assurances of continued cooperation. The prosecution was aware of all this evidence. Most critically, no reference is made in the opinion to Love's testimony at Martinez' second trial that he skipped bond in 1975 while awaiting trial for forgery in Albuquerque, New Mexico.[1] Rec., vol. V, State Court Transcripts, Transcript of Testimony of Sam Love, Jr. (hereinafter "Love Testimony"), at 38–39. This testimony was elicited by Bert Atkins, the prosecutor with primary responsibility for both *New Mexico v. Martinez* and *New Mexico v. Lujan* throughout the investigation and prosecution of the two cases. Rec., vol. VIII, Transcript of Proceedings (hereinafter "Proceedings"), vol. 5, at 1289. In addition, although the opinion mentions that Love was awaiting trial in Oklahoma, majority op. at 924–25, it does not indicate that Love's probation officer, Elaine Hargrove, notified the prosecution of Love's arrest for grand larceny in Oklahoma on May 27, 1982, by letter dated June 9, 1982. Rec., vol. VIII, Proceedings, vol. 5, at 1298. It is unclear whether the letter stated that Love could receive a twenty year sentence if convicted, but the prosecution knew that Love faced possible prosecution for probation violation in New Mexico as a result, *id.* at 1301–02, and the nature of the charge

---

1. Ironically, Love was serving time for this forgery when he allegedly witnessed Martinez murder fellow inmate Thompson.

clearly put the prosecution on notice that he faced the possibility of receiving a substantial jail term as well.

Nor does the majority accord any significance to the fact that the prosecution worked closely with Love's probation officer to make arrangements for his various trips to New Mexico, *id.* at 1299, although it acknowledges that the probation officer served Love with the invalid State of New Mexico subpoena for the September 8, 1982, Martinez trial, *id.* at 1316. Despite this close working relationship, the prosecution apparently never asked, and allegedly did not discover, when Love was scheduled for trial in Oklahoma until September 8, 1982, the first day of the Martinez trial. *Id.* at 1300. These circumstances suggest that the state had a rather cavalier attitude about securing Love's presence at the third trial, especially considering the significance of Love's testimony and the fact that a capital offense was involved. Similarly, the majority attaches no significance to the prosecution's knowledge that Oklahoma authorities had released Love on bond pending his criminal trial there.

I also am concerned about the majority's resolution of the unavailability issue. I agree that the related questions of whether a party acted in good faith to secure a witness' attendance at trial and whether the witness is unavailable are mixed questions of fact and law reviewable *de novo* by this court. I disagree, however, with the evaluation of these questions under what I understand to be a "totality of the circumstances" standard, and also with the outcome of this evaluation.

I would adopt a per se rule requiring use of the Uniform Act, when available and applicable, as a condition precedent to findings that a party made a good-faith attempt to secure a witness, and that the

witness is unavailable. In my view, the reasoning of *Barber v. Page*, 390 U.S. 719, 724–25, 88 S.Ct. 1318, 1321–22, 20 L.Ed. 2d 255 (1968), and *Mancusi v. Stubbs*, 408 U.S. 204, 210–14, 92 S.Ct. 2308, 2311–14, 33 L.Ed.2d 293 (1972), support this position, although neither opinion expressly so holds.[2] *Barber* identified the Uniform Act as one of several contemporary procedures responsible for "largely depriv[ing] of ... any continuing validity" the traditional rule that a witness' absence from a jurisdiction supports a finding of "unavailability." *Barber*, 390 U.S. at 723 & n. 4, 88 S.Ct. at 1321 & n. 4. More importantly, in announcing the good-faith standard, the Court outlined the standard's parameters by juxtaposing it against a position it clearly indicated fell outside those parameters: the appellate court's reasoning that it is unnecessary to invoke a particular procedure if requests thereunder might be refused. *Id.* at 724, 88 S.Ct. at 1321. In so doing, the Court effectively held that the potential ineffectiveness of available procedural process is not a valid basis under the good-faith standard for not invoking that process. *Mancusi* reinforced the importance placed by the Court on the invocation of the Uniform Act and other available methods as a predicate to a finding of good faith. *See* 408 U.S. at 212, 92 S.Ct. at 2312.

Numerous state courts have adopted a per se rule relying on *Barber* and *Mancusi*, albeit without analysis. *See e.g.*, *State v. Gray*, 616 S.W.2d 102, 105 (Mo.App.1981) (characterizing the per se approach as the "majority rule"); *State v. Hills*, 379 So.2d 740, 743–44 (La.1980); *State v. Ray*, 123 Ariz. 171, 173, 598 P.2d 990, 992 (1979) (en banc); *Ormound v. Sheriff, Clark County*, 95 Nev. 173, 591 P.2d 258, 259 (1979) (per curiam); *State v. Kim*, 55 Haw. 346, 519 P.2d 1241, 1244–45 (1974); *In re Terry*, 4 Cal.3d 911, 95 Cal.Rptr. 31, 484 P.2d 1375, 1389–90 (1971); *cf. Brooks v. State*,

---

**2.** The majority asserts that adoption of a per se rule would contravene the Supreme Court's decisions in *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), and *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), because these cases hold that the prosecution's efforts to secure a witness' presence are to be measured against a "good faith" and "rea-

sonableness" standard. Majority op. at 924 n. 1. The Uniform Act offers the only legally effective means of securing the presence of an out-of-state witness. In the context of dealing with an out-of-state witness, therefore, good faith and reasonableness *necessarily require* use of the procedures available under the Act.

35 Md.App. 461, 371 A.2d 674, 678 (1977). State court support for this position is not unanimous, however. *See, e.g., Utah v. Chapman,* 655 P.2d 1119, 1122–23 (Utah 1982) (noting per se approach is majority rule, but declining to follow it); *Wisconsin v. Zellmer,* 100 Wis.2d 136, 301 N.W.2d 209, 214 (1981) (declining to read *Barber* as requiring use of the Uniform Act).

Two federal district court cases, *Eastham v. Johnson,* 338 F.Supp. 1278, 1281 (E.D.Mi.1972), and *Poe v. Turner,* 353 F.Supp. 672, 674 (D.Utah 1972), have read *Barber,* standing alone or in conjunction with *Mancusi,* to require that the Uniform Act be utilized. The Ninth Circuit is apparently the only circuit court that has considered whether *Barber* mandates the use of the Uniform Act as a condition precedent to a finding of good faith.[3] In *Daboul v. Craven,* 429 F.2d 164, 167 (9th Cir.1970), the court read *Barber* as "indicat[ing] that if the prosecution fails to make use of the Uniform Act ... it has not made the required 'good faith effort....' " The precedential value of *Daboul* is limited, however, because the court found the petitioner's state remedies unexhausted as to this issue, and so did not reach the merits. In *Gorum v. Craven,* 465 F.2d 443, 445 (9th Cir.1972), the court acknowledged *Daboul's* reading of *Barber.*

Whatever precedential vitality *Daboul* once possessed is called into question by the reasoning and holding of *Dres v. Campoy,* 784 F.2d 996, 999 (9th Cir.1986). The context of the court's reference to *Daboul* suggests that it considered the case binding precedent, but inapplicable because the prosecution did not know the witness' current location. However, the court also rejected the petitioner's argument that the prosecution's efforts were not in good faith because the prosecution knew the witness' previous address for months before the

scheduled date of the second trial, yet never resorted to the procedures established by the Uniform Act. It construed the prosecution's actions as a legitimate response to a tactical dilemma: subpoena the witness under the Uniform Act and risk her fleeing (as she had before the preliminary hearing), or use another method and risk the court finding a lack of good faith.[4] In distinguishing a California state court case, the court expressly stated that

"[t]he prosecution should not have to comply with the procedures of the Uniform Act when it appears that an out-of-state witness is cooperative or more likely to testify on the basis of an informal agreement than under the compulsion of a subpoena."

*Id.* at 1001.

I am not persuaded by the majority's reasoning in *Dres.* As the dissent there points out, the majority's assumption that the witness was more likely to flee when faced with a court order to appear than when faced with her mother's promise to produce her seems far-fetched at best. *Id.* at 1002 (Hug, J. dissenting). The specious nature of this assumption is readily apparent because of the lack of evidence that the issuance of the subpoena caused the witness to flee before the preliminary hearing. On the face of it, it seems far more likely that the prospect of having to attend the impending hearing, not the subpoena itself, caused her to flee. Even assuming that the issuance of a subpoena pursuant to the Uniform Act would have increased the likelihood of the witness fleeing, this possibility must be counterbalanced by the fact that California could legally compel her presence only by means of a Uniform Act subpoena. The analytical framework used by the *Dres* majority is thus defective in terms of *Barber's* holding that the potential ineffectiveness of available procedural

---

**3.** The Fifth Circuit in *Mechler v. Procunier,* 754 F.2d 1294, 1297 (5th Cir.1984), held that the prosecution acted in good faith in attempting to secure the presence of an out-of-state witness when, *inter alia,* it obtained two subpoenas pursuant to the Uniform Act, but Illinois authorities were unable to locate the witness.

**4.** The alternative of detaining the witness for trial pursuant to the Uniform Act was not available according to the court. The California courts have interpreted the California Constitution to limit the amount of time a material witness can be held for trial to approximately two weeks, and the witness fled three weeks before the trial.

process cannot be relied on to justify the failure to invoke that process under the good-faith standard. In sum, I believe that the circumstances of *Dres* present precisely the type of situation in which use of the Uniform Act should be required as a condition precedent to a finding of good faith.

In addition to the support for a per se rule found in the case law, policy considerations militate in favor of such a rule. As both *Dres* and this case demonstrate, the application of a "totality of the circumstances" approach lends itself to attempts to manipulate the determination of the unavailability question. There will likely always be some circumstances to justify a party asserting that they acted in good faith in not using the Uniform Act: the witness appeared to be cooperative, or had been so in the past, the party faced a tactical dilemma, etc. Parties are encouraged to be less than rigorous in securing witnesses' attendance where such arguments might prove effective. The possibility of such tactical manipulation is especially offensive where, as here, the testimony of the out-of-state witness is central to the case. Adopting a per se rule that requires timely resort to the Uniform Act, when applicable and available, would discourage this kind of tactical maneuvering. In my view, drawing the line at use of the Uniform Act makes sense because the Act provides the only means of issuing legally effective process against an out-of-state witness.

We need not adopt a per se rule, however, in order to conclude that the prosecution failed to establish its good faith in attempting to secure the presence of witness Love. On *de novo* review, this court must make an independent determination of the issues before it, reviewing the record in light of its own independent judgment. *Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1464 (10th Cir.1988). This record amply demonstrates that under a "totality of the circumstances" test, the state should have employed the Uniform Act. It is significant that Love was arrested in Oklahoma after the second trial. This fact clearly undercuts the prosecution's contention that its efforts to bring

Love to New Mexico for Martinez' third trial occurred "under the same set of circumstances" as the prior occasions. Proceedings, vol. 5, at 1296. On these other occasions, Love was not facing criminal charges with the possibility of receiving a twenty year sentence and/or having his probation revoked.

The most critical fact is the prosecution's knowledge that Love once before had skipped bond while awaiting trial. This knowledge standing alone casts doubt on the prosecution's assertion that it had "[n]o reason whatsoever" to suspect that Love would not appear as scheduled. *Id.* Combined with its awareness of Love's arrest in Oklahoma, this knowledge of Love's previous behavior completely undermines the prosecution's claim. The prosecution could not but have been aware that Love's arrest was likely to dramatically alter his assessment of whether to continue cooperating. Returning to New Mexico could not any longer have seemed advantageous to Love, for even though he had received consideration for his earlier cooperation, rec., vol. VIII, Proceedings, vol. 5, at 1308, 1317–18, 1326; rec., vol. V, Love Testimony, at 72–75, he could not have expected such consideration to extend to protecting him from prosecution for such a serious probation violation, an event he knew could result in his reincarceration, *id.* at 76. And reincarceration meant Love would likely be the target of reprisals because he had testified against fellow inmates. These facts, combined with Love's reputation with prison officials as a "con man," rec., vol. IX, Proceedings, vol. 7, at 1999, and his history of criminal activity involving dishonesty and misrepresentation, rec. vol. V, Love Testimony, at 35–43, made unreasonable the state's reliance on Love's previous cooperation and his assurances of continued cooperation.

These circumstances are closely analogous to those in *State v. Case*, 752 P.2d 356 (Utah App.1987). In *Case*, the state subpoenaed to a preliminary hearing a victim-witness hospitalized in-state. The victim-witness subsequently left the state but gave the prosecuting attorney's office a

forwarding address in Alabama. She acknowledged receipt of a State of Utah subpoena for the trial, and contacted the prosecuting attorney's secretary approximately 8 other times, each time indicating her willingness to attend the trial. On the morning of the trial, she called to inform the prosecution she would not appear. As here, her testimony was central to the case. The court noted the Utah Supreme Court's holding that use of the Uniform Act is permissive, but concluded that the victim-witness' "lifestyle and nomadic habits ma[d]e it clear that she possessed the potential to disappear or refuse to appear at trial." *Id.* at 358. In light of her potential unreliability, the court held that the prosecution's reliance on the victim-witness' telephoned assurances was unreasonable and that it should have invoked the procedures of the Uniform Act. *Id.* Similarly, Love's prior history of skipping bond, his arrest subsequent to the second trial, and his extensive criminal record made his potential unreliability so unmistakably clear, in my opinion, that it was unreasonable for the prosecution not to resort to the Uniform Act, notwithstanding Love's prior cooperation and assurances of continued cooperation.[5]

My conclusion that the trial court deprived petitioner of his Sixth Amendment right to confront witnesses by finding Sam Love unavailable and by admitting his preliminary hearing testimony does not end the inquiry, for not all errors of constitutional dimension are reversible errors. *See Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 1797, 100 L.Ed.2d 284 (1988); *Graham v. Wilson*, 828 F.2d 656, 659 (10th Cir.1987); *Chapman v. California*, 386 U.S. 18, 21–22, 87 S.Ct. 824, 826–27, 17 L.Ed.2d 705 (1967). The Supreme Court has held as a general rule that a constitu-

tional error is harmless if the beneficiary of the error can prove beyond a reasonable doubt that it did not contribute to the verdict. *Id.* at 24, 87 S.Ct. at 828. The harmless error rule thus "focus[es] on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986).

Notwithstanding the general rule, the Court has recognized that some constitutional errors are "so fundamental and pervasive that they require reversal without regard to the facts or circumstances of the particular case." *Id.* Errors of this type include the introduction of a coerced confession, *Payne v. Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958) (cited in *Chapman*, 386 U.S. at 23 n. 8, 87 S.Ct. at 828 n. 8); the complete denial of the right to counsel, *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); the absence of counsel from an arraignment when that results in the irretrievable loss of unasserted defenses, *White v. Maryland*, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963); the adjudication of a case before a biased judge, *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); and the existence of a conflict of interest in representation throughout a proceeding, *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). "Harmless-error analysis thus presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury." *Rose v. Clark*, 478 U.S. 570, 578, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1985).

In addition, the Court has indicated that in assessing the appropriateness of applying harmless-error analysis to a specific constitutional error, it is concerned with

---

5. The majority disputes the significance of facts I rely on in reaching this conclusion. Majority op. at 926 n. 3. The majority's first argument, that Oklahoma's decision to release Love on bond supports New Mexico's contention that it had no reason to suspect Love would skip bond, is misfocused. Even assuming that Oklahoma and New Mexico authorities were equally well equipped to assess Love's reliability, the prosecution had responsibility for making its own

independent assessment. Love was a crucial witness in a murder trial in New Mexico, an important additional consideration. The majority's second contention, that the incident of Love skipping bond had occurred prior to the first and second trials and yet he appeared voluntarily, disregards the changed circumstances before the third trial; namely, that Love was facing reincarceration in Oklahoma, and likely probation revocation in New Mexico.

ensuring that the record contains the information necessary for reviewing courts to determine whether the error was harmless. Thus, the Court in *Satterwhite* observed that

" '[i]n the normal case where a harmless-error rule is applied, the error occurs at trial and its scope is readily indentifiable. Accordingly, the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the error materially affected the deliberations of the jury.... [A]ny inquiry into a claim of harmless error ... [for a violation such as a deprivation of the right to conflict-free representation which cannot be discerned from the record] would require, unlike most cases, unguided speculation.' "

*Satterwhite*, 108 S.Ct. at 1797 (quoting *Holloway*, 435 U.S. at 490–91, 98 S.Ct. at 1173). If a Sixth Amendment violation "abort[s] the basic trial process" or "denie[s] it altogether," *Rose*, 478 U.S. at 578 n. 6, 106 S.Ct. at 3106 n. 6 (citations omitted), or is of a kind that contaminates the whole proceeding, leaving no easily identifiable trace in the record and necessitating "difficult inquiries concerning matters that might have been, but were not, placed in evidence," *id.* at 579 n. 7, 106 S.Ct. at 3107 n. 7, then harmless-error analysis is inappropriate.

The trial court's admission of Love's preliminary hearing testimony based on it's erroneous conclusion that he was unavailable does not fall within any of these categories. Moreover, although I have found no case directly on point, the Court's reliance on the harmless-error standard in closely analagous cases makes clear that the standard applies here as well. *Cf. Satterwhite*, 108 S.Ct. 1792 (harmless error rule applies to admission of expert psychiatric testimony based on examination conducted in violation of Sixth Amendment right to counsel); *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) (applying harmless error analysis to admission of non-testifying co-defen-

dants' confessions in violation of *Bruton* ); *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972) (same); *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438 ("the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, *like other Confrontation Clause errors*, is subject to *Chapman* harmless-error analysis") (emphasis added).

Harmless-error review is *de novo*. *Graham*, 828 F.2d at 659; *see also Harrington*, 395 U.S. at 254, 89 S.Ct. at 1728. Applying the harmless-error doctrine to this case convinces me that the admission of Love's preliminary hearing testimony was not harmless. The State of New Mexico relied primarily on the testimony of six men who were inmates at Camp Sierra Blanca the night of Scott Wayne Thompson's death, August 1, 1981. Five of these men, Martin Garza, Robert Keener, Billy Ray Hughes, Andrew Mitchell, and Thomas Hayward, lived in Bonito Lodge, the residence of defendant Martinez and the victim Thompson. The sixth individual, Sam Love, resided in Desert Lodge, the front of which faced the back of Bonito Lodge. The testimony of all the witnesses was impeached to greater and lesser degrees, primarily on the basis of prior inconsistent statements and their receipt of early parole or shortened parole periods. In addition, the reliability of their testimony was called into question by the numerous conflicts between their versions of the events.

Garza testified that earlier in the day on August 1, 1981, Martinez told him "I don't want him [Thompson] there. I am going to take him out." Rec., vol. VII, Proceedings, vol. 3, at 879. Later that evening, Garza saw Martinez hit Thompson once when they were in the t.v. room, *id.* at 896, and heard Martinez ask Thompson if he wanted to go outside and fight, *id.* at 912. He never saw Martinez take Thompson outside, *id.* at 896, 903, because he went to his room after trying to dissuade David Sedillo[6] from getting involved, *id.* at 875. Before leaving the t.v. room, Garza witnessed

---

**6.** The original criminal complaint for Thompson's murder named David Sedillo, as well as Martinez. Rec., vol. IV, State Court Record, at

10. Sedillo pled guilty pursuant to a plea agreement with the State on June 15, 1982. *Id.* at 236.

Sedillo poke Thompson in the shoulder with a safety pin he had pulled out of his pocket, and kick him. *Id.* at 872–73. Garza testified that after returning to his room, he looked out his window when he heard "very loud" screams from the direction of Desert Lodge, and he saw pool players run out the back door of Desert Lodge. *Id.* at 876–77. Finally, Garza testified to the following interchange with co-defendant Richard Lujan when Lujan came into his room about 5–10 minutes after he returned to it:

> "Lujan said, 'They're going to rape him.' That they had taken him outside. And then I said, 'No, they're going to kill him.' And then he [Lujan] added, 'I believe so.'"

*Id.* at 892.[7]

Robert Keener similarly testified to seeing Martinez hit Thompson in the t.v. room, but he claimed to have seen blood on Thompson's face. Rec., vol. VII, Proceedings, vol. 4, at 920. Keener further stated that after hearing Thompson verbally refuse to go outside, he heard the screen door of Bonito Lodge slam, *id.* at 923, but he never heard any commotion or scuffling outside, *id.* at 957. Although Keener never testified that he saw Martinez leave Bonito Lodge, he asserted that he saw Martinez enter Bonito Lodge's back door about 20–30 minutes after he heard the screen door slam. *Id.* at 924, 937.

Billy Ray Hughes testified that he saw Martinez in the t.v. room standing over Thompson, who was bleeding from his mouth or nose, but that Lujan prevented him from intervening. *Id.* at 996–97. He also claimed to have seen Martinez pick up a pool cue from the other end of the couch at that time. *Id.* at 1117. When he returned later with fellow inmates Robert Shaw and Thomas Hayward, he saw Martinez hitting Thompson about his face and chest area, and Sedillo kicking Thompson in the face. *Id.* at 998. Hughes never saw

anybody, or anything happen, outside of Bonito Lodge that evening. *Id.* at 1119.

Like Billy Ray Hughes, Andrew Mitchell testified that he saw Martinez standing over Thompson, and Thompson bleeding from the face. *Id.* at 1175–76. Mitchell asserted, though, that Martinez was kicking Thompson in the face while Sedillo and Lujan stood watch. *Id.* at 1174–75. Somewhat later he heard Martinez tell Thompson to go outside, heard more than one set of footsteps go outside, and then heard the screen door close. *Id.* at 1178. Yet still later, Mitchell claimed that as Lujan was wiping up blood from the t.v. room floor, someone rattled the window and Lujan went to the window and talked to the person. Lujan then got Martinez and both of them went outside. *Id.* at 1179–80.

Thomas Hayward testified that although he heard a fight going on in Bonito Lodge, he did not see anything because Lujan stopped him and fellow inmates Joey Swint, Andrew Mitchell, Robert Shaw, Billy Ray Hughes, and Robert Keener, from entering the t.v. room. Rec., vol. VIII, Proceedings, vol. 5, 1216–18. He also heard the fight move outside, and when he later looked out his window, saw Martinez hitting, and Sedillo kicking, a bloody-faced but still conscious Thompson as he lay on the ground six feet behind Bonito Lodge. *Id.* at 1218–20. Hayward did not see any weapons when he looked out his window. *Id.* at 1280.

Disregarding all the conflicts in the testimony and the impeachment of the witnesses, which are matters for the jury in weighing the credibility of the evidence, the testimony of five of the state's eyewitnesses indicated that Martinez, Sedillo, and Thompson were involved in an altercation in Bonito Lodge's t.v. room the night of August 1.[8] The altercation included Martinez and Sedillo hitting and kicking Thompson, and Sedillo poking Thompson with a safety pin, to such an extent that

---

7. The last sentence of this statement, "I believe so," was not admitted into evidence at the second trial. Rec., vol. VII, Proceedings, vol. 3, at 910–11.

8. Martinez testified that he yelled at and hit Thompson in the t.v. room. Rec., vol. IX, Proceedings, vol. 7, at 2138–40. Sedillo also recounted the altercation between Martinez and Thompson. *Id.* at 2033.

Thompson was bleeding. Only one witness' testimony linked Martinez and Sedillo to Thompson later the same evening in back of Bonito Lodge.

Against this evidentiary backdrop, the state called its final inmate witness, the "unavailable" Sam Love. The state read into the record substantially all of his preliminary hearing testimony.[9] Love testified that moaning and groaning sounds from the direction of Bonito Lodge prompted him to turn around just as he was entering Desert Lodge. When he turned he saw Martinez, Sedillo, and Lujan "whipping on another dude." Rec., vol. II, Preliminary Hearing Transcript, at 75. Love was unable to see the person being beaten to identify him, but his description of the person's clothes matched those Thompson had on when his body was discovered. *Id.* at 137–138. Sometime later, Love stated, he looked out the front door and saw Martinez, Sedillo, and Lujan carrying the person they had been beating towards Desert Lodge. *Id.* at 78. Still later, Love looked out the bathroom window and saw Martinez kick the person a couple of times, saw Sedillo hit him with a pool cue once, and saw Lujan watching the events. *Id.* at 79–83, 165–66. Five to ten minutes after he looked out the bathroom window, Love saw Martinez enter Desert Lodge and say something to someone, and saw Sedillo enter Desert Lodge and heard him showering. *Id.* at 84–87. As Sedillo left the bathroom, Love saw him sticking something in his pocket, the imprint of which looked like a "shank" or homemade knife 3 to 4 inches in length, with a blade 1 to 1 & ½ inches wide. *Id.* at 93, 190–91.

The question we face is whether we can be sure "beyond a reasonable doubt that the error complained of [the admission of Love's prior testimony] did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828; *see also Satterwhite*, 108 S.Ct. at 1798. Viewed in this

context, the critical nature of Sam Love's testimony is readily apparent. Prior to Love's testimony, only Mitchell and Hayward placed Martinez out of doors the night of August 1, and only Hayward connected Martinez with Thompson outside of Bonito Lodge. Love not only corroborated Hayward's testimony by linking Martinez to the beating of someone outside of Bonito Lodge, he also linked Martinez to the carrying of that person from behind Bonito Lodge to behind Desert Lodge, and the further beating of the person in back of Desert Lodge where Thompson's body ultimately was discovered. Love's testimony thus was the only evidence actually connecting Martinez to a person wearing clothes identical to Thompson during a sequence of events out of doors the night of August 1, and placing Martinez at the location where Thompson's body was discovered. The prosecution even acknowledged that Love was the only state's witness who would so testify. Rec., vol. VIII, Proceedings, vol. 5, at 1328–29. Moreover, Sedillo, who had pled guilty to second degree murder, testified that he alone was responsible for the murder. Rec., vol. IX, Proceedings, vol. 7, at 2030–32. In the second trial, where the jury assessed Love's credibility, the vote was 10–2 for acquittal. Rec., vol. VIII, Proceedings, vol. 5, at 1329. Consequently, I cannot "confidently say, on the whole record, that the constitutional error [here] was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 681, 106 S.Ct. at 1436.

I am persuaded by my review of the case law that use of the Uniform Act, when applicable and available, should be a condition precedent to a finding of good faith and unavailability. Because the prosecution failed to employ the Act's procedures, I conclude that it did not act in good faith and that Love therefore was not unavailable. My review of the record under the majority's "totality of the circumstances"

---

9. Sam Love's testimony at the second trial, rec., vol. V, State Court Transcripts, Transcript of Testimony of Sam Love, Jr. (Love Testimony), was also read into the record, primarily for purposes of impeachment by defense counsel. Rec., vol., VII, Proceedings, vol. 5, at 1347,

1376–86. Love testified to the same basic events at the second trial, but numerous details differed such as his claim that he saw Martinez with a "shank," or homemade knife. Rec., vol. V, Love Testimony, at 19–20.

standard also convinces me that the prosecution's efforts were not in good faith and that Love therefore was not unavailable. Because I conclude that the state court's error in finding Love unavailable is not harmless, I would grant Martinez' petition for habeas corpus contingent on the State of New Mexico's decision to conduct a new trial.